1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| DINA RODRIQUEZ, | Civil No.    05cv1455-WQH(POR) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| | **DENYING PLAINTIFF'S MOTION** |
| v. | **FOR REVERSAL AND/OR REMAND** |
| | **AND GRANTING DEFENDANT'S** |
| JO ANNE B. BARNHART, Commissioner of | **CROSS-MOTION FOR SUMMARY** |
| Social Security, | **JUDGMENT** |
| Defendant. | **[Doc. Nos. 12, 14]** |

### I.  Introduction

Plaintiff Dina Rodriguez brings this action pursuant to 42 U.S.C. §§ 1383(c)(3)[1] and 405(g)[2],

to obtain judicial review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title

---

[1] 42 U.S.C. § 1383(c)(3) provides:

The final determination of the Commissioner of Social Security after a hearing [to determine
eligibility or amount of benefits] shall be subject to judicial review as provided in section 405(g)
of this title...

[2] 42 U.S.C. § 405(g) provides:

Any individual, after any final decision of the Commissioner of Social Security made after a
hearing to which he was a party ... may obtain a review of such decision by a civil action ...
brought in the district court of the United States.... The court shall have power to enter, upon the
pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision
of the Commissioner of Social Security, with or without remanding the cause for a rehearing.
The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall
be conclusive.

XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, et seq.  Ms. Rodriguez filed a motion for reversal and/or remand.  In that motion Ms. Rodriguez argues she should have been found disabled under the Act and that the Commissioner's decision adopting Administrative Law Judge ("ALJ") David L. Wurzel's decision of September 8, 2004, denying her benefits should be reversed because the ALJ's decision is not supported by substantial evidence.  The Commissioner has filed a cross-motion for summary judgment.  In that motion, the Commissioner argues the ALJ's decision is supported by substantial evidence and is not based on legal error.

Pursuant to Southern District of California Local Civil Rule 7.1(d)(1), the Court finds these motions may be decided on the papers and that no oral argument is necessary.  After careful consideration of the papers, the administrative record, and the applicable law, the Court recommends Plaintiff's motion for reversal and/or remand be DENIED and Defendant's cross-motion for summary judgment be GRANTED.

## II.  Procedural History

On November 19, 2001, Ms. Rodriguez filed an application for Social Security Income ("SSI") with the Social Security Administration ("Administration").  (A.R. at 300.)  The claim was denied initially and on reconsideration.  (A.R. at 301-4, 306-9.)  Subsequently, Ms. Rodriguez requested a hearing before an ALJ to consider her application a third time.  On June 27, 2003, ALJ David L. Wurzel conducted a hearing to consider the merits of Ms. Rodriguez's application.  (Id.) This hearing resulted in her application being denied by the ALJ in a written decision dated September 8, 2004.  (A.R. 15-38.)  Ms. Rodriguez subsequently requested review by the Appeals Council, but the Appeals Council found no basis to grant review.  (A.R. at 5-7.)  Thus, the ALJ's decision became the final determination of the Commissioner of Social Security.

On July 21, 2005, after having exhausted all administrative remedies, Ms. Rodriguez initiated this action challenging the ALJ's decision.  (Complaint at 1.)  On June 7, 2006, Ms. Rodriguez filed a motion for reversal and/or remand arguing the ALJ (1) erred by disregarding the opinion, diagnosis, and mental residual functional capacity assessment of Dr. Strobl; (2) inadequately weighed the treating physicians' opinions; and (3) erred by using information from a medical textbook.  On July 25, 2006, the Commissioner filed a cross-motion for summary judgment

arguing the ALJ (1) properly weighed Dr. Strobl's opinion; (2) properly weighed the opinions of Ms. Rodriguez's treating physicians; and (3) did not err by using information from a medical textbook.

### III.  Factual Background

#### A.  The Record

Ms. Rodriguez was born on September 9, 1968.  (A.R. at 300.)  At the alleged date of onset of her disability on September 1, 2001, Ms. Rodriguez was 32-years-old.  (A.R. at 119.)  Ms. Rodriguez claims she has chronic fatigue and extreme joint pain, and is unable to walk at times and cannot walk for long periods.  (A.R. at 119.)  She represents she is unable to work because of these conditions.  (Id.)  According to her work history report, Ms. Rodriguez has worked as a cashier, receptionist, administrative assistant, and daycare provider.  (A.R. at 132.)

With respect to her medical condition at the time of the hearing, Ms. Rodriguez indicated she has rheumatoid arthritis and fibromyalgia.  (A.R. at 328.)  According to Ms. Rodriguez, her condition causes her to sleep a lot and prevents her from doing things around her house.  (Id.)  She also stated that she gets headaches "a lot."  (Id.)  Ms. Rodriguez indicated that for the past 12 months, she sleeps everyday for four to six hours during the hours of 8:00 a.m. and 5:00 p.m.  (A.R. at 352.)  Further, she wakes up four to five times during the night.  (A.R. at 352.)

Ms. Rodriguez takes the following medication for her rheumatoid arthritis: Azuelfidine, Diclofenac, Topamax, Folic Acid, and Oxycontin.  (A.R. at 331-33.)  She takes Zanaflex to help her sleep at night.  (A.R. at 353.)  Dr. Strobl also prescribed her Zoloft.  (A.R. at 335.)

With respect to her current living situation, Ms. Rodriguez lives with her husband and three children.  (A.R. at 326.)  She and her husband hired a woman from Tijuana named Selena who helps around the house three times a week.  (A.R. at 345.)  Selena does the laundry and prepares large dinners.  (A.R. at 345-46.)  Ms. Rodriguez's husband shops for food.  (Id.)  Ms. Rodriguez only cooks small simple meals two to three days a week.  (A.R. at 347.)

According to Ms. Rodriguez, she reviews her children's homework once a week for 15-20 minutes and she helps her children get their clothes ready for school.  (A.R. at 343-44.)  Ms. Rodriguez is able to drive and picks up her nine-year-old daughter from school daily.  (A.R. at 343-

44.)  She also attends her son's hour-and-a-half long baseball games once every other week.  (A.R. at 348.)

As for her baby, Ms. Rodriguez changes diapers, feeds her baby, and prepares the formula. (A.R. at 344.)  However, Ms. Rodriguez typically does not take care of the baby.  (A.R. at 349.) Usually, Ms. Rodriguez's husband, her parents, and Selena take care of the baby.  (Id.)

**B.  Medical Evidence Presented**

**1.      Roy Kaplan, M.D.**

On January 20, 1999, Dr. Kaplan indicated in a Roentgenologic Report that Ms. Rodriguez's right hand was normal.  (A.R. at 283.)  He found that the soft tissues and bone mineralization were normal.  (Id.)  The joint spaces were well maintained.  (Id.)  He noted no bony abnormalities and no abnormalities involving the right fifth metacarpal.  (Id.)

On August 20, 2001, Ms. Rodriguez visited Dr. Kaplan complaining of stiff legs, aches, fatigue, a torn right knee, and symptoms Dr. Kaplan associated with fibromyalgia.  (A.R. at 210, 274.)  Dr. Kaplan noted that Ms. Rodriguez generally looked well.  (Id.)  He diagnosed Ms. Rodriguez with lumbosacral stenosis, fibromyalgia syndrome, migraines, and fatigue.  (Id.)

On January 30, 2002, Dr. Kaplan filled out a Physical Capacities Evaluation.  (A.R. at 247, 265.)  Dr. Kaplan opined that in an eight-hour workday, Ms. Rodriguez can sit, stand, and walk for half-hour intervals for a total of two hours.  (Id.)  Dr. Kaplan also found that Ms. Rodriguez has the capacity to occasionally lift up to 20 pounds, but never lift 21-100 pounds.  (Id.)  With respect to her ability to carry, she can occasionally carry up to five pounds, but she can never carry six to 100 pounds.  (Id.)  According to Dr. Kaplan's assessment, Ms. Rodriguez can use both hands for repetitive action, such as simple grasping and fine manipulation.  (Id.)  However, she cannot use her hands for pushing and pulling of arm controls.  (Id.)  Further, Dr. Kaplan found she cannot use either foot for repetitive movements as in pushing and pulling of leg controls.  (Id.)  Dr. Kaplan opined Ms. Rodriguez can occasionally bend, squat, and reach, but cannot crawl or climb.  (Id.)  He also found she is not restricted from activities involving unprotected heights or driving automotive equipment.  (Id.)  Finally, Dr. Kaplan found Ms. Rodriguez is moderately restricted from being around moving machinery, and totally restricted from exposure to marked changes in temperature

and humidity and exposure to dust, fumes, and gases.  (Id.)

On November 27, 2002, Ms. Rodriguez visited Dr. Kaplan complaining of bilateral knee pain, aches, feeling sick all of the time, and symptoms Dr. Kaplan associated with fibromyalgia. (A.R. at 269.)  Dr. Kaplan noted she generally looked well.  (Id.)  He diagnosed her with "flare of fibromyalgia," headaches, postpartum, and obesity.  (Id.)

Labwork from November 27, 2002 revealed Ms. Rodriguez had a rheumatoid arthritis factor level of 14 international units/milliliter.  (A.R. at 272.)  The reference range for "normal" is less than 14 international units/milliliter.  (Id.)

On March 19, 2003, Ms. Rodriguez visited Dr. Kaplan complaining of headaches, postpartum syndrome, and symptoms he associated with fibromyalgia.  (A.R. at 261.)  Dr. Kaplan noted again that Ms. Rodriguez generally looked well.  (Id.)  He found her condition had improved. (Id.)

On June 11, 2003, Ms. Rodriguez returned to Dr. Kaplan complaining of sinusitis, vertigo, morning stiffness, low back pain, fatigue, and symptoms he associated with fibromyalgia.  (A.R. at 259.) Dr. Kaplan noted again Ms. Rodriguez generally looked well.  (Id.)  He diagnosed her with axial pain, back pain, and sinusitis.  (Id.)

Finally, on June 17, 2003, Dr. Kaplan ordered a lumbar spine and AP pelvis examination for Ms. Rodriguez.  (A.R. at 255-56.)  The lumbar spine examination revealed Ms. Rodriguez's lumbar spine was normal.  (A.R. at 255.)  The AP pelvis examination also showed her pelvis was normal. (A.R. at 256.)

**2.     Jack D. Schim, M.D., A.P.C.**

On January 29, 2003, Dr. Schim wrote a letter to Dr. Kaplan regarding his evaluation of Ms. Rodriguez.  (A.R. at 266-68.)  Dr. Kaplan referred Ms. Rodriguez to Dr. Schim for an evaluation of headaches.  (A.R. at 266.)  Dr. Schim conducted a physical and neurologic examination of Ms. Rodriguez.  (A.R. at 267.)

Dr. Schim's physical examination showed Ms. Rodriguez to be a "well-developed, somewhat overweight woman in no acute distress."  (Id.)  He further found her "neck range of motion is full and painless.  She has some mild tightness in the trapezius and cervical paraspinous, primarily on

the right.  There are no localized trigger areas and no definite spasm."  (Id.)

As for his neurologic examination, Dr. Schim found "bulk, strength, and tone are normal in all extremities."  (Id.)  He also opined her "deep tendon reflexes are symmetrical and normoactive, including biceps, triceps, brachioradialis, patellar, and Achilles reflexes.  Plantar response is flexor bilaterally."  (Id.)

Based on his examination, Dr. Schim recommended that Ms. Rodriguez maintain a headache diary.  (A.R. at 268.)  He also asked her to start a trial on Zanaflax and to discontinue the daily use of Tylenol.  (Id.)

### 3.   Ngoc Minh Pham, M.D.

On November 18, 2002, Dr. Pham filled out a Medical Source Statement of Ability to do Work-Related Activities (Physical) form.  (A.R. at 236-39.)  Dr. Pham found Ms. Rodriguez can occasionally lift 10 pounds and frequently lift less than 10 pounds.  (A.R. at 236.)  He opined that Ms. Rodriguez can stand and/or walk less than two hours in an eight-hour workday.  (Id.)  He also noted that she must periodically alternate sitting and standing every half-hour.  (A.R. at 237.)  Dr. Pham found Ms. Rodriguez's ability to push and/or pull is limited in her upper and lower extremities.  (Id.)  As for postural limitations, Dr. Pham opined she can occasionally balance, crouch, and crawl, but she can never climb, kneel, or stoop.  (Id.)  In addition, Dr. Pham found manipulative limitations in that Ms. Rodriguez's capabilities regarding reaching in all directions, handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors) are limited.  (A.R. at 238.)  She can only perform these manipulative functions occasionally.  (Id.)  Further, Dr. Pham found she has unlimited seeing, hearing, and speaking capabilities.  (Id.)  Finally, Dr. Pham opined Ms. Rodriguez has environmental limitations to temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gases.  (A.R. at 239.)

On January 14, 2002, Ms. Rodriguez visited Dr. Pham complaining of pain in her right shoulder.  (A.R. at 243.)  After physically examining her, Dr. Pham diagnosed her with having right shoulder pain.  (Id.)

On February 18, 2002, Ms. Rodriguez visited Dr. Pham.  (A.R. at 242.)  Dr. Pham's record of her visit consisted of a checklist-type form consisting of a list of parts of the body where Dr.

Pham can check off "normal" or "abnormal" next to each named part of the body. During this visit, Dr. Pham marked "throat" and "extremities" as abnormal and everything else as normal. (Id.) Dr. Pham diagnosed Ms. Rodriguez with acute pharyngitis. (Id.)

On March 4, 2002, Ms. Rodriguez visited Dr. Pham. (Id.) Dr. Pham marked "throat," "neck," and "extremities" as abnormal and everything else as normal. (Id.) Dr. Pham diagnosed Ms. Rodriguez with upper respiratory infection. (Id.)

On August 7, 2002, Ms. Rodriguez visited Dr. Pham complaining of knee pain. (A.R. at 241.) At this visit, Dr. Pham only marked "eyes" and "extremities" as abnormal. (Id.) Dr. Pham diagnosed Ms. Rodriguez with arthritis.

On October 15, November 5, and November 18, 2002, Ms. Rodriguez visited Dr. Pham complaining of pain in her knees and ankles. (A.R. at 240-41.) Again, Dr. Pham utilized his checklist form. During these visits, Dr. Pham indicated Ms. Rodriguez's back and extremities were abnormal. (Id.) After all three visits, Dr. Pham diagnosed Ms. Rodriguez with arthritis. (Id.)

On February 11, 2003, Dr. Pham filled out a Physical Capacities Evaluation form. (A.R. at 246.) Dr. Pham found Ms. Rodriguez can sit, stand, and walk for a half an hour at one time in an eight-hour workday. (Id.) He opined that during the entire eight-hour workday, she can sit, stand, and walk for a total of one and one-half hours per activity. (Id.) Dr. Pham also found she can frequently lift up to five pounds, lift six to ten pounds occasionally, and never lift 11-100 pounds. (Id.) With respect to her ability to carry at work, Dr. Pham believed she can frequently carry up to five pounds, occasionally carry six to ten pounds, and never carry 11-100 pounds. (Id.) Further, he opined Ms. Rodriguez can use her left and right hands for repetitive actions such as simple grasping. (Id.) However, he found that she cannot use her hands for repetitive actions such as pushing and pulling of arm controls and fine manipulation. (Id.) Additionally, he found she cannot use her feet for repetitive movements as in pushing and pulling of leg controls. (Id.) Moreover, Dr. Pham opined Ms. Rodriguez can occasionally bend, squat, and crawl, but she cannot climb or reach. (Id.) Finally, Dr. Pham found she is totally restricted from activities involving unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. (Id.)

Dr. Pham also filled out a Mental Assessment form. (A.R. at 245.) There is no indication on the form as to when Dr. Pham filled out this form. The form required Dr. Pham to check off boxes rating Ms. Rodriguez's (1) understanding and memory, and (2) sustained concentration and persistence. (Id.) He did not check off any of the boxes. Instead, Dr. Pham made a handwritten notation indicating that he gave Ms. Rodriguez Zoloft for two months for her depression. (Id.)

**4.   Donald L. Strobl, M.D.**

Ms. Rodriguez first visited Dr. Strobl on February 27, 2003. (A.R. at 293.) Dr. Strobl filled out an initial evaluation form to assess Ms. Rodriguez's current symptoms and stressors/relevant history. (Id.) Dr. Strobl conducted the initial evaluation in two sessions. (Id.) Dr. Strobl did not diagnose Ms. Rodriguez with anything at this visit.

On June 3, 2003, Ms. Rodriguez visited Dr. Strobl. (A.R. at 287-90.) At this visit, Dr. Strobl prescribed Zoloft. (Id.) Dr. Strobl evaluated Ms. Rodriguez's mental status. (A.R. at 290.) He found her appearance was appropriate, and she was well groomed. (Id.) He opined she had a cooperative attitude and apprehensive behavior. (Id.) He believed her eye contact was fair and her verbal behavior/speech clear. (Id.) As for conversation, he noted she was both spontaneous and relevant. (Id.) Dr. Strobl opined her mood was depressed and anxious. (Id.) However, he found that suicidal and homicidal ideation were both absent. (Id.) He believed her affect was appropriate, perception was normal, and memory was intact. (Id.) Dr. Strobl also opined Ms. Rodriguez's intelligence was average and her concentration was impaired by history. (Id.)

During this visit, Dr. Strobl diagnosed Ms. Rodriguez with pain disorder associated with both psychological factors and a general medical condition. (A.R. at 291.) Additionally, he found Ms. Rodriguez's global assessment function (GAF) to be in the range of 55-60, depicting moderate symptoms. (Id.) Dr. Strobl did not provide Ms. Rodriguez with a treatment plan or set up a date for her next appointment. (A.R. at 292.)

On that same day, Dr. Strobl filled out a Mental Residual Functional Capacity Assessment. (A.R. at 248-50.) Dr. Strobl opined Ms. Rodriguez was moderately limited in her ability to remember locations and work-like procedures, and understand and remember detailed instructions. (A.R. at 248.) He found she was not significantly limited in her ability to understand and remember

very short and simple instructions.  (Id.)  He further found she was moderately limited in her ability to: (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, and (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance.  (Id.)  However, she was not significantly limited in her ability to: (1) carry out very short and simple instructions, (2) sustain an ordinary routine without special supervision, and (3) make simple work-related decisions.  (Id.)  Additionally, Dr. Strobl opined Ms. Rodriguez was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods.  (A.R. at 249.)  With respect to her ability to interact socially, Dr. Strobl found she was not significantly limited in her ability to ask simple questions or request assistance, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Id.)  He did, however, find she was moderately limited in her ability to interact appropriately with the general public.  (Id.)  Finally, Dr. Strobl believed Ms. Rodriguez was moderately limited in her ability to travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others.  (Id.)

On July 15, 2003, Dr. Strobl filled out another Mental Residual Functional Capacity form upon the request of Ms. Rodriguez's attorney for purposes of Ms. Rodriguez's claim for Social Security Disability benefits.  (A.R. at 251-253.)  On this form, Dr. Strobl marked that Ms. Rodriguez's degree of limitation in the following areas was moderate: restrictions of activities of daily living, difficulties in maintaining social functioning, deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner, and ability to perform detailed and varied tasks.  (A.R. at 251.)  He further opined she had the ability to interact with the public and supervisors and sustain capacity to perform work at a consistent pace for four hours per day, and the ability to interact with co-workers for two hours per day.  (Id.)  He also found she had the ability to work without needing more than one five minute break per hour.  (A.R. at 252.)  However, Dr. Strobl did not find she had the ability to complete a normal workday without interruptions from psychiatric symptoms or the ability to complete a normal workweek without interruptions from psychiatric symptoms.  (Id.)  Dr. Strobl opined Ms. Rodriguez's psychological symptoms would

1   cause her to be absent from work 10+ days per month.  (Id.)  Additionally, Dr. Strobl was asked to

2   comment on Ms. Rodriguez's ability to concentrate and persist on work tasks for eight hours at a

3   time in a competitive workplace.  (Id.)  In response, Dr. Strobl wrote, "She reports that would be

4   impossible."  (Id.)  He also found she could possibly remember work instructions, safety

5   precautions, locations of work tools and procedures.  (Id.)  Finally, Dr. Strobl believed her long term

6   memory was "ok" and her short term memory was mildly impaired.  (Id.)

7          **5.    Frederick W. Close, M.D.**

8          On April 2, 2002, Dr. Close performed a consultative examination of Ms. Rodriguez.  (A.R.

9   at 219-22.)  Based on his physical examination, Dr. Close found Ms. Rodriguez stands and walks

10  with a normal gait, is able to stand on her heels and toes, and her heel and toe walking are normal.

11  (A.R. at 220.)  He also found her range of motion for the following is grossly normal: cervical spine,

12  dorsal lumbar spine, hips, knees, ankles, shoulders, elbows, wrists, and fingers/hands.  (A.R. at 220-

13  21.)  Dr. Close found some generalized low back pain, but noted that Ms. Rodriguez "does not

14  exhibit the classic required positive number of trigger point areas of tenderness to qualify for a

15  fibromyalgia diagnosis at this time."  (A.R. at 221.)  Dr. Close diagnosed Ms. Rodriguez with

16  mechanical low back pain.  (Id.)  In his functional assessment of Ms. Rodriguez, Dr. Close opined

17  that after her pregnancy, she should be able to sit eight hours and stand and walk eight hours out of

18  an eight-hour day.  (Id.)  Further, he opined she can lift and carry 50 pounds occasionally and 25

19  pounds frequently.  (Id.)  He found she "should be limited to [sic] frequent bending, stooping, and

20  crouching."  (Id.)  Finally, Dr. Close opined Ms. Rodriguez has no manipulative or visual

21  limitations.  (Id.)

22          **6.    Physical Residual Functional Capacity Assessment**

23          The administrative record reflects two Physical Residual Functional Capacity Assessments

24  of Ms. Rodriguez.  (A.R. at 223-30.)

25          On April 23, 2002, Gary Miya, M.D., a state agency medical consultant, completed a

26  Physical Residual Functional Capacity Assessment of Ms. Rodriguez.  (Id.)  With respect to

27  exertional limitations, Ms. Rodriguez can occasionally lift and/or carry 50 pounds, frequently lift

28  and/or carry 25 pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of

1   about six hours in an eight-hour workday, and has the unlimited ability to push and/or pull.  (A.R. at

2   224.)  As for postural limitations, Ms. Rodriguez can frequently climb ramps/stairs, balance, stoop,

3   kneel, crouch, and crawl.  (A.R. at 225.)  However, she cannot climb ladders, ropes, or scaffolds.

4   (Id.)  Dr. Miya found no manipulative, visual, communicative, environmental limitations

5   established.  (A.R. at 226.)

6        Dr. Miya also considered and evaluated an August 20, 2001 lab test that resulted in a positive

7   ANA titre and found no evidence of fibromyalgia.  (A.R. at 278.)  Specifically, Dr. Miya found that

8   there was "no physical evidence of joint disease on exam" and that specific tests, including the

9   residual functional capacity assessment were negative for fibromaylgia.  (A.R. at 230.)

10       On September 9, 2002, James A. Haaland, M.D., a state agency medical consultant, affirmed

11  Dr. Miya's findings.  (A.R. at 230.)  Both Drs. Miya and Haaland opined Ms. Rodriguez has the

12  physical residual functional capacity to perform medium level work.  (A.R. at 231.)

13  **C.  Vocational Evidence Presented**

14        John Kilcher testified at the administrative hearing as a vocational expert.  (A.R. at 356-81.)

15  The ALJ presented several hypotheticals encompassing various aspects of Plaintiff's physical and

16  mental limitations.

17       The first hypothetical, referred to as "hypothetical A" by the ALJ, assumed the following

18  facts and limitations: an individual of the same age, education, and work history as Ms. Rodriguez;

19  able to lift and carry 10 pounds frequently and 20 pounds occasionally; able to sit, stand and walk

20  for six hours in an eight-hour day; never climbing ladders, ropes, or scaffolds except in an

21  emergency; never kneeling or crawling except in an emergency; occasionally climbing ramps and

22  stairs; occasionally stooping and crouching; occasionally balancing; no reaching or working

23  overhead with the dominant right upper extremity; avoiding all exposure to extremes of heat, cold

24  and humidity; and no repetitive power gripping or twisting with either hand.  (A.R. at 357-58.)

25  Assuming all of the limitations in hypothetical A, Mr. Kilcher found that Ms. Rodriguez could

26  return to her past work as a child daycare worker, sales clerk, price marker, and assembler of printed

27  products.  (A.R. at 358, 360.)

28       The next hypothetical, referred to as "hypothetical B" by the ALJ, assumed the following in

1   addition to the limitations already stated in hypothetical A: lifting and carrying up to ten pounds;

2   sitting for six hours; standing and walking for two hours in an eight-hour day with all the

3   nonexertional limitations already given in hypothetical A.  (A.R. at 359.)  Mr. Kilcher found Ms.

4   Rodriguez could return to her past work as a receptionist at the sedentary exertional levels with all

5   of the nonexertional limitations in hypothetical A.  (A.R. at 360-61.)

6         The third hypothetical, referred to as  "hypothetical C" by the ALJ, assumed the following in

7   addition to all of the limitations already stated in hypothetical B: a further limitation allowing a

8   change of position as between sitting and standing every 30 minutes.  (A.R. at 361.)  Mr. Kilcher

9   found Ms. Rodriguez would not be able to work as a receptionist.  (Id.)  However, there are other

10  available jobs such as:  production worker (500 positions regionally and 100,000 positions

11  nationally); addresser (300 positions regionally and 100,000 positions nationally); call out operator

12  (400 positions regionally and 140,000 positions nationally); telephone quotation clerk (200 positions

13  regionally and 170,000 positions nationally; final assembler (600 positions regionally and 500,000

14  positions nationally); and dial screw assembler (200 positions regionally and 400,000 positions

15  nationally).  (A.R. at 361-64.)

16        The fourth hypothetical, referred to as "hypothetical D" by the ALJ, assumed the following

17  in addition to limitations already stated in hypothetical C: a further limitation to unskilled work with

18  no close or frequent interpersonal contact with the public.  (A.R. at 363.)  Based on this

19  hypothetical, Mr. Kilcher found that the following jobs would be available: production worker with

20  the same number of positions as previously stated; addresser with the same number of positions as

21  previously stated; final assembler with the same number of positions as previously stated; and dial

22  screw assembler with the same number of positions as previously stated.  (A.R. at 363-64.)

23        The fifth hypothetical, referred to as "hypothetical E" by the ALJ, was a hypothetical posed

24  by Ms. Rodriguez's attorney, Mary Prusinskas.  Hypothetical E assumed the following: consider

25  sedentary residual functional capacity; lifting and carrying ten pounds occasionally, less than ten

26  pounds frequently; standing and walking less than two hours in an eight-hour day; sitting six hours

27  in an eight-hour day with an alternate to sit or stand every 30 minutes; limited pushing and pulling

28  with the upper and lower extremities; no climbing of ramps, stairs, ladders, ropes and scaffolding;

no kneeling, no stooping; occasional balancing, crouching and crawling; limited reaching in all directions, including overhead; occasional handling bilateral; occasional fingering bilateral; occasional exposure to temperature extremes, noise, dust, vibration, humidity and wetness, hazards (meaning machinery and heights, hazardous machinery, and unprotected heights), fumes, odors, chemicals, and gases.  (A.R. at 365-69.)  Ms. Prusinskas indicated that these limitations were taken from Dr. Pham's November 18, 2002 Medical Source Statement of Ability to do Work-Related Activities (Physical) form.  (A.R. at 236-39, 369.)  Ms. Prusinskas further stated she interpreted the term "limited" to mean "occasional."  Mr. Kilcher found Ms. Rodriguez would not be able to return to any of her past work and there would not be any other work available in significant numbers in the local or national economy.  (A.R. at 369.)

Ms. Prusinskas asked another hypothetical, referred to as "hypothetical F" by the ALJ, that assumed the limitations in hypothetical C and the following limitations: sedentary work activity; marked limitation in her ability to complete a normal workday or workweek and marked limitations in her ability to perform at a consistent pace.  (A.R. at 371.)  Ms. Prusinskas indicated that these limitations came from Dr. Strobl's June 3, 2003 Mental Residual Functional Capacity Assessment.  (A.R. at 249.)  Ms. Prusinskas interpreted the term "marked" to mean "more than occasional bordering on frequent."  (A.R. at 371.)  Mr. Kilcher found that Ms. Rodriguez would not be able to perform her past relevant work.  (Id.)

The ALJ then asked Mr. Kilcher to interpret the term "marked" to mean "more than moderate, less than extreme, seriously interfering with sustained work but not precluding sustained work."  (A.R. at 372.)  Based on the ALJ's definition of "marked," Mr. Kilcher found that Ms. Rodriguez can work in all of the same jobs he listed in his answer to hypothetical C.  (A.R. at 375.)

**D.  ALJ's Findings**

After lengthy discussion of the documents and medical evidence presented and the testimony of Ms. Rodriguez and vocational expert, the ALJ determined Ms. Rodriguez was not entitled to disability insurance benefits under the Act.  (A.R. at 36-37.)

The ALJ found Ms. Rodriguez had not engaged in substantial gainful activity since her alleged disability onset date of September 1, 2001.  (A.R. at 36.)  The ALJ found the medical

evidence established Ms. Rodriguez had impairments considered "severe" under the Act and regulations.  (Id.)  The ALJ determined Ms. Rodriguez has the following impairments: "minimal disc bulging; lumbosacral spine, without any spinal cord or peripheral nerve involvement; headaches; sinusitis; chondromalacia patella, left knee; tendinitis, dominant right shoulder; and pain disorder associated with both psychological factors and a general medical condition."  (Id.) However, the ALJ found her medically determinable impairments, alone or in combination, did not meet or medically equal any listing in Appendix 1, Subpart P, Regulations No. 4 and 16.  (Id.)  With respect to the "B" criteria of the psychiatric review technique, the ALJ found Ms. Rodriguez has "mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and has had one documented episode of decompensation of extended duration."  (Id.)

The ALJ found Ms. Rodriguez has the residual functional capacity to perform work activity at the sedentary exertional level with the following nonexertional limitations: "never climbing ladders, ropes, or scaffolds except in an emergency; occasionally climbing ramps and stairs; never kneeling or crawling except in an emergency; occasionally balancing, stooping, and crouching; no reaching or working overhead with the dominant right upper extremity; avoiding all exposure to extremes of heat, cold, or humidity; no repetitive power gripping or twisting with either hand; allowance for a sit-stand option every 30 minutes; and mentally limited to unskilled work with no close of [sic] frequent interpersonal contact with the public."  (Id.)  The ALJ did not find Ms. Rodriguez's subjective allegations regarding her impairments credible.  (Id.)

Further, the ALJ found Ms. Rodriguez is unable to perform the requirements of her past relevant work.  (A.R. at 37.)  The ALJ's finding is supported by the vocational expert's testimony. (Id.)  Although Ms. Rodriguez has a skilled background, she has no skills or semi-skills transferable to other work within the limitations of her residual functional capacity.  (Id.)  Again this finding is supported by the vocational expert's testimony.  (Id.)  The ALJ found that Ms. Rodriguez's residual functional capacity to perform sedentary work is reduced by her nonexertional limitations.  (Id.) Had she had the capacity to perform the full range of sedentary/light work, medical-vocational guideline 201.21 would direct a finding of "not disabled."  (Id.)  Consequently, the ALJ used

medical vocational guideline 201.21 as a framework for determining whether there were jobs Ms. Rodriguez can perform.  (Id.)

Although Ms. Rodriguez has no skills or semi-skills transferable to other work, the ALJ found she is capable of performing unskilled work.  (A.R. at 36.)  The ALJ found, and the vocational expert's testimony supported his finding, that there are jobs Ms. Rodriguez can perform and sustain on a regular and continuing basis that exist in significant numbers in the national economy.  (A.R. at 37.)  According to the ALJ, Ms. Rodriguez can work as a: production worker, where there are 500 jobs locally and 100,000 jobs nationally; addresser, where there are 300 jobs locally and 100,00 jobs nationally; final assembler, where there are 600 jobs locally and 500,00 jobs nationally; and dial screw assembler, where there are 200 jobs locally and 400,000 jobs nationally.  (Id.)

## IV.  Discussion

### A. Legal Standard

The SSI program established by Title XVI of the Act provides benefits to disabled persons without substantial resources and little income.  42 U.S.C. § 1983.  To qualify, a claimant must establish inability to engage in "substantial gainful activity" because of a  "medically determinable physical or mental impairment."  42 U.S.C. § 1382c(a)(3)(A).  The disabling impairment must be so severe that, considering age, education, and work experience, the claimant cannot engage in any kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner makes this assessment by a five-step analysis.  First, the claimant must not currently be working.  20 C.F.R. § 416.920(b).  Second, the claimant must have a "severe" impairment.  20 C.F.R. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  20 C.F.R. § 416.920(d).  Fourth, if the claimant can do her past work, benefits are denied.  20 C.F.R. § 416.920(e).  Fifth, if the claimant cannot do her past work and, considering the claimant's age, education, work experience, and residual functional capacity, cannot do other work that exists in the national economy, benefits are awarded.  20 C.F.R. § 416.920(f).  The last two steps of the analysis are required by statute.  42 U.S.C. § 1382c(a)(3)(B).

In addition, when evaluating the severity of a claimant's alleged mental impairments, the Commissioner uses a "special technique" at each level in the review process.  20 C.F.R. § 416.1520a.  To be considered disabled under the Act, the claimant must have (1) a medically determinable mental impairment(s), 20 C.F.R. § 416.1520a(b)(1),[3] and (2) exhibit specified functional limitations as a result of that impairment(s) that prohibit the claimant from engaging in any gainful activity.  20 C.F.R. § 416.1520a(b)(2).  If the claimant has a medically determinable mental impairment but does not exhibit the requisite functional limitations, the claimant may nevertheless still be considered disabled if the claimant exhibits clusters of symptoms or a syndrome that indicate the inability to engage in gainful activity.  20 C.F.R. § 404.1520a(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.A. (impairment(s) must either pose functional limitations or cause symptoms or a syndrome to support finding of disabled).

Section 1383(c)(3) of the Social Security Act, through Section 405(g) of the Act, allows unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C. §§ 1383(c)(3), 405(g).  The scope of judicial review is limited, however, and the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1988) (citing Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)).

Substantial evidence means "more than a mere scintilla" but less than a preponderance.  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Secretary of Health & Human Services, 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.

---

[3] There are nine diagnostic categories that the Act considers to be medically determinable mental impairment(s): Organic mental disorders (12.02); schizophrenic, paranoid, and other psychotic disorders (12.03); affective disorders (12.04); mental retardation (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.A.

1  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  When the evidence is inconclusive, "questions

2  of credibility and resolution of conflicts in the testimony are functions solely of the Secretary."

3  Sample, 694 F.2d at 642.

4      The ALJ has a special duty in social security cases to fully and fairly develop the record in

5  order to make an informed decision on a claimant's entitlement to disability benefits.  DeLorme v.

6  Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  Because disability hearings are not adversarial in

7  nature, the ALJ must "inform himself about the facts relevant to his decision," even if the claimant is

8  represented by counsel.  Id. (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983)).

9      Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions,

10  the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing

11  the evidence and reaching his or her decision.  Benitez v. Califano, 573 F.2d 653, 655 (9th Cir.

12  1978).  Section 405(g) permits a court to enter a judgment affirming, modifying, or reversing the

13  Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to

14  the Social Security Administrator for further proceedings.  Id.

15  **B. Ms. Rodriguez's Claims**

16      Ms. Rodriguez makes three arguments in her motion for reversal and/or remand.  First, Ms.

17  Rodriguez alleges the ALJ's opinion regarding Plaintiff's mental residual functional capacity is not

18  based upon substantial evidence.  Second, Ms. Rodriguez alleges the ALJ accorded inadequate

19  weight to her treating physicians.  Third, she argues that the ALJ erred by consulting and using

20  information from a medical textbook.

21      **1.      Dr. Strobl's Opinion**

22      Ms. Rodriguez first argues the ALJ's findings regarding her mental residual functional

23  capacity was not based on substantial evidence.  Specifically, Ms. Rodriguez contends the ALJ

24  disregarded Dr. Strobl's diagnosis and mental residual functional capacity assessment without

25  producing contradictory or inconsistent evidence from the record.  However, the Commissioner

26  asserts the ALJ properly weighed Dr. Strobl's opinion.

27

28

The Ninth Circuit distinguishes among the opinions of three types of physicians:[4] (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  A treating source is defined as a physician or psychologist who has provided the claimant with medical treatment or evaluation and either has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  As a general rule, more weight is given to the opinion of a treating source than to that of a nontreating physician.  Id. (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).  Likewise, the opinion of an examining physician is typically entitled to greater weight than that of a nonexamining physician.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).

However, the treating and examining physician's findings and conclusions are not necessarily dispositive as to either a physical condition or the ultimate issue of disability.  Regennitter v. Commissioner of the Social Security Administration, 166 F.3d 1294, 1298 (9th Cir. 1998); Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (citing Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).  The ALJ may disregard the treating or examining physician's findings and conclusions whether or not those findings and conclusions are contradicted.  Lester, 81 F.3d at 830-31; Magallanes, 881 F.2d at 750.  For instance, the ALJ need not accept the ultimate conclusion of a physician if it is conclusionary, brief and unsupported by clinical findings.  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).  Likewise, where evidence in the record, such as laboratory test results, contrary reports from examining physicians, and the claimant's own testimony, conflicts with the findings of the physician, the ALJ may properly reject such an opinion.  Magallanes, 881 F.2d at 751.

The ALJ is nonetheless required to consider every medical opinion in the record and determine the weight to give each opinion.  20 C.F.R. § 416.927(d).  While the ALJ need not state whether he rejects or accepts a particular opinion, the ALJ must still provide evidence he considered

---

[4] For purposes of this opinion, the term "physician" or "doctor" includes psychologists and other health professionals who do not have medical degrees.  20 C.F.R. § 416.927 (defining "medical opinions" as "statements from physicians and psychologists and other acceptable medical sources," and prescribing the respective weight to be given the opinions of treating sources and examining sources).

1    each opinion so that the reviewing court may draw legitimate inferences as to how the ALJ viewed a

2    particular physician's findings and opinions.  Magallanes, 881 F.2d at 751.

3           Here, the ALJ considered Dr. Strobl's opinion and thoroughly explained how he viewed his

4    findings and opinions.  Although the ALJ believed Dr. Strobl "accepted at face value" Ms.

5    Rodriguez's subjective complaints, he nevertheless afforded Dr. Strobl's functional assessments

6    "moderate weight."  (A.R. at 29.)  By assigning moderate weight to Dr. Strobl's opinion, the ALJ

7    implicitly did not reject his findings as Ms. Rodriguez contends.

8           In determining whether to characterize Dr. Strobl as a treating physician or examining

9    physician, the ALJ considered Dr. Strobl's treatment plan for Ms. Rodriguez and the frequency and

10   nature of her visits.  (A.R. at 29.)  Although Ms. Rodriguez claims that Dr. Strobl was a treating

11   physician, the ALJ found Dr. Strobl to be an examining physician.  (A.R. at 29.)  The medical record

12   indicates Dr. Strobl met with Ms. Rodriguez on two occasions: February 27, 2003 and June 3, 2003.

13   (A.R. at 293-94, 287-92.)  He filled out two mental residual functional assessment forms dated June

14   3, 2003 and July 15, 2003.  (A.R. at 248-52.)  Although the record shows Dr. Strobl prescribed Ms.

15   Rodriguez Zoloft on June 3, 2003, he had not provided her a treatment plan as of that visit.  (A.R. at

16   287, 292.)  This visit constituted Ms. Rodriguez's last visit with Dr. Strobl.  There is no evidence of

17   an ongoing treatment relationship between Dr. Strobl and Ms. Rodriguez considering the lack of

18   treatment provided by Dr. Strobl and infrequent visits by Ms. Rodriguez.  Therefore, the ALJ

19   properly concluded Dr. Strobl was an examining physician.

20          The ALJ adopted Dr. Strobl's diagnosis that Ms. Rodriguez has "pain disorder associated

21   with both psychological factors and a general medical condition."  (A.R. at 36, 291.)  The ALJ also

22   adopted Dr. Strobl's assessment that Ms. Rodriguez is "mentally limited to unskilled work with no

23   close of [sic] frequent interpersonal contact with the public."  (A.R. at 36.)  Additionally, the ALJ

24   incorporated a couple of Dr. Strobl's assessments into hypothetical questions presented to the

25   vocational expert.  (A.R. at 363, 371-72.)

26          Further, the ALJ's ratings of the severity of Ms. Rodriguez's mental impairment, pursuant to

27   the criteria set forth in the regulations, were the same as that of Dr. Strobl's ratings for three out of

28   the four categories.  (A.R. 36, 251-52.)  The only difference was the ALJ rated Ms. Rodriguez's

1   restrictions in activities of daily living as "mild" whereas Dr. Strobl rated her restriction as

2   "moderate." (A.R. at 36, 251.) The ALJ rated this restriction less since he did not find Ms.

3   Rodriguez's subjective allegations credible. (A.R. at 31-33.)

4       Finally, Ms. Rodriguez contends that the ALJ was required to present clear and convincing

5   reasons for rejecting Dr. Strobl's uncontroverted opinion. (Plaintiff's Motion at 6.) However, this

6   was not necessary since the ALJ did not reject Dr. Strobl's diagnosis, but rather he granted moderate

7   weight to his opinion and adopted his diagnosis. (A.R. at 29, 36.)

8       Based on the Court's review of the record, this Court finds that the ALJ's discussion of the

9   Dr. Strobl's findings is sufficient to allow the Court to infer that his opinion was considered. A

10  review of the record also shows the ALJ's findings regarding Ms. Rodriguez's mental residual

11  functional capacity was based on substantial evidence given the fact that the ALJ gave Dr. Strobl's

12  assessment moderate weight and adopted his diagnosis.

13      **2.     Weight Accorded to Treating Physicians**

14      Ms. Rodriguez argues that the ALJ improperly disregarded the opinions of Drs. Pham and

15  Kaplan, her treating physicians. Ms. Rodriguez contends that the ALJ improperly rejected their

16  opinions by failing to set out specific, legitimate reasons for the rejection. However, the

17  Commissioner argues the ALJ properly rejected the opinions of Drs. Pham and Kaplan and

18  articulated several reasons for the rejection.

19      An ALJ need not give controlling weight to the opinion of a treating physician. "Although a

20  treating physician's opinion is generally afforded the greatest weight in disability cases, it is not

21  binding on an ALJ with respect to the existence of an impairment or the ultimate determination of

22  disability." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) The treating physician's

23  opinion on the ultimate issue of disability is not necessarily conclusive. Matney, 981 F.2d at 1019.

24  The ALJ may disregard the treating physician's opinion if the ALJ sets forth "specific, legitimate

25  reasons . . . based on substantial evidence." Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir.1989).

26  The ALJ can meet this burden of substantial evidence by "providing a detailed summary of the facts

27  and conflicting clinical evidence, along with a reasoned interpretation thereof." Id. However,

28  "[w]here the opinion of the claimant's treating physician is contradicted, and the opinion of a

1   nontreating source is based on independent clinical findings that differ from those of the treating

2   physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely

3   the province of the ALJ to resolve the conflict."  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir

4   1995).  Finally, the ALJ need not accept an opinion of a treating physician if it is "conclusionary and

5   brief and unsupported by clinical findings."  Matney, 981 F.2d at 1019.

6        In the instant case, the ALJ rejected Dr. Pham's diagnosis that Ms. Rodriguez has arthritis.

7   (A.R. at 27.)  The ALJ properly rejected Dr. Pham's diagnosis.  First, Dr. Pham's opinion is

8   conclusionary, brief, and unsupported by clinical findings.  Second, Dr. Pham's diagnosis is

9   inconsistent with his own opinions from Ms. Rodriguez's various visits.  Third, objective medical

10  evidence in the record do not support a finding of arthritis.

11       Dr. Pham utilized a checklist-type form to record several of Ms. Rodriguez's visits. (A.R. at

12  240-42.)  On these forms, Dr. Pham checked "normal" or "abnormal" beside a list of parts of the

13  body.  When Dr. Pham checked "abnormal," he provided no explanation as to findings.  On August,

14  7, October 15, November 5, and November 18, 2002, Dr. Pham diagnosed Ms. Rodriguez with

15  arthritis.  (A.R. at 240-241.)  However, his diagnosis was brief and conclusionary as he failed to

16  articulate and explain the reasons for his findings.  Besides these forms, there are no other records

17  from Dr. Pham to support his diagnosis.

18       Further, Dr. Pham's diagnosis is inconsistent with his own opinions.  Specifically, on

19  January 14, 2002, Dr. Pham opined Ms. Rodriguez exhibited normal bones and joints, extremities,

20  neck and back.  (A.R. at 243.)  On February 18, and March 4, 2002, Dr. Pham found her abdomen,

21  heart, lungs, back and reflexes were "normal."

22       Moreover, several records dating from 1994 to 2003 do not support a finding of arthritis.  For

23  instance, a MRI dated December 8, 1994, showed a normal cervical spine.  (A.R. at 193.)

24  Additionally, a MRI dated December 22, 1994, showed Ms. Rodriguez's spine was normal and

25  indicated only a "minimal bulge at L4-5 not affecting the thecal sac or exiting roots."  (A.R. at 192.)

26  Further, on January 20, 1999, a roentgenologic report of Ms. Rodriguez's right hand showed "soft

27  tissues are normal.  Bone mineralization is normal.  The joint spaces are well maintained.  No bony

28  abnormalities are noted.  Specifically, no abnormalities involving the right fifth metacarpal bone

noted." (A.R. at 218.)  Based on that report, Ms. Rodriguez's right hand was found to be normal.

(Id.)  Finally, on June 17, 2003, an examination of her lumbar spine and pelvis showed normal

results.  (A.R. at 255-256.)   Thus, the ALJ could properly reject Dr. Pham's diagnosis.

With respect to Dr. Pham's functional assessments, the ALJ afforded them "little weight."

(A.R. at 27-28.)  Dr. Pham's functional assessments are contradicted by the opinion of Dr. Close, a

nontreating source whose opinion is based on independent clinical findings.  Dr. Close's opinion is

based on his own examination of Ms. Rodriguez as well as a review of a medical report by Ned

Chambers, M.D., Rich Richard, M.D., and Roy A. Kaplan, M.D.[5]  (A.R. at 219.)  Since Dr. Close's

opinion is based on independent clinical findings that differ from those of Dr. Pham's opinions, Dr.

Close's opinion may itself be substantial evidence.  See Andrews, 53 F.3d at 1041.  Since it is within

the sole province of the ALJ to resolve this type of conflict, the ALJ could properly decide Dr.

Pham's assessment carried little weight.

The ALJ did "not give great weight to [Dr. Kaplan's] functional assessments because they

are based primarily on his diagnosis of fibromyalgia which is not a medically determinable

impairment in this case." (A.R. at 27.)  The ALJ properly discounted Dr. Kaplan's assessments

since there was insufficient evidence in the record to support his diagnosis of fibromyalgia.

Specifically, Dr. Kaplan's records do not support a finding for fibromyalgia.  Like Dr. Pham's

records, his records indicating a diagnosis of fibromyalgia are conclusionary, brief, and unsupported

by clinical findings.  (A.R. at 210, 272, 274.)  His records lack any explanation regarding his

diagnosis.  The records mostly detail Ms. Rodriguez's subjective complaints.  (Id.)  However, the

records provide very little information in the "Objective" section of the form that would explain a

finding of fibromyalgia and simply state "FMS" (fibromyalgia syndrome) under the "Assessment"

section of the form.  (Id.)

Ms. Rodriguez argues that Dr. Kaplan's diagnosis was based on objective medical evidence.

In particular, she asserts that an August 20, 2001 lab test that resulted in a positive ANA titre is

objective medical evidence of fibromyalgia.  (Plaintiff's Motion at 16, A.R. at 278.)  However, Drs.

---

[5] Dr. Close indicates in his report that he has reviewed a report compiled by Drs. Chambers, Richard and Kaplan.  However, the Court was unable to review this report since there is no record of it in the medical record.

1   Miya and Haaland considered and evaluated this lab result and found no evidence of fibromyalgia.

2   Specifically, Dr. Miya found, and Dr. Haaland affirmed, that there was "no physical evidence of

3   joint disease on exam" and that specific tests, including the residual functional capacity assessment

4   were negative for fibromaylgia.  (A.R. at 230.)

5       Not only did the residual functional capacity assessments by Drs. Miya and Haaland not

6   indicate a finding of fibromyalgia, but neither did Dr. Close's examination results.  Dr. Close found

7   Ms. Rodriguez "does not exhibit the classic required positive number of trigger point areas of

8   tenderness to qualify for a fibromyalgia diagnosis."  (A.R. at 221.)

9       Furthermore, upon referral by Dr. Kaplan, Dr. Schim examined Ms. Rodriguez and found

10  full and painless range of motion in the neck, some mild tightness in the trapezius and cervical

11  paraspinous, but found no localized trigger areas and no definite spasm.  (A.R. at 267.)  He also

12  found "bulk, strength, and tone are normal in all extremities."  (Id.)

13      In sum, the ALJ provided specific, legitimate reasons, supported by medical records, for not

14  giving great weight to Dr. Kaplan's functional assessments.  The ALJ found Dr. Kaplan's opinion

15  brief, conclusionary and unsupported by medical evidence.  He also found substantial objective

16  medical evidence in the record contradicting Dr. Kaplan's diagnosis.  Thus, the ALJ did not err in

17  discounting Dr. Kaplan's opinion.

18      Finally, Ms. Rodriguez argues the ALJ failed to include all of Dr. Pham's and Dr. Kaplan's

19  opinions regarding Ms. Rodriguez's limitations in a hypothetical to the vocational expert.

20  (Plaintiff's Motion at 19.)  The hypotheticals that the ALJ posed to the vocational expert contained

21  all of the limitations that the ALJ found credible and supported by substantial evidence in the record.

22  As previously discussed, the opinions of Drs. Pham and Kaplan were not supported by substantial

23  evidence.  Therefore, the ALJ's reliance on testimony the vocational expert gave in response to the

24  hypotheticals was proper.  See Magallanes, 881 F.2d at 756-57 (holding that it is proper for an ALJ

25  to limit a hypothetical to restrictions supported by substantial evidence in the record).

26      **3.    ALJ's Use of Information from a Medical Textbook**

27      Ms. Rodriguez argues that the ALJ erred by consulting and using information from a medical

28  textbook to deny her benefits.  (Plaintiff's Motion at 19-20.)

1    Under the Social Security Act regulations, "evidence may be received at the hearing even

2    though inadmissible under rules of evidence applicable to court procedures."  20 C.F.R. § 416.1442.

3    "Because the SSA must handle a huge volume of cases and the ALJ has the affirmative duty in such

4    cases for developing the facts fairly, the ALJ should take notice of adjudicative facts, whenever, 'the

5    ALJ at the hearing knows of information that will be useful in making the decision.'" Banks v.

6    Schweiker, 654 F.2d 637, 640-41 (9th Cir. 1981) (quoting Davis, Administrative Law Treatise §

7    15:19 at 200 (2d ed. 1980)).  When an agency decision rests on official notice, a party must be given

8    "on timely request, . . . an opportunity to show the contrary."  Banks, 654 F.2d at 641 (quoting 5

9    U.S.C. § 556(e)).

10    Here, the ALJ utilized the diagnostic criteria for fibromyalgia published by the American

11    College of Rheumatologists.  (A.R. at 23.)  The diagnostic criteria was useful because it indicated

12    the two types of clinical findings necessary to diagnose fibromyalgia.  Although a party must be

13    given an opportunity to show the contrary, Ms. Rodriguez made no request to be given such an

14    opportunity.  Furthermore, at the hearing, the ALJ provided Ms. Rodriguez an opportunity to object

15    to the admittance of the diagnostic criteria.  He specifically asked if there was any objection to the

16    numbered exhibits and Ms. Prusinskas stated, "No objection, Your Honor."[6]  (A.R. at 314.)

17    Therefore, the ALJ did not err by using the diagnostic criteria published by the American College of

18    Rheumatologists.

19    **V.  Conclusion**

20    After a thorough review of the record and the papers submitted and based on the reasons set

21    forth above, the Court finds (1) the ALJ's finding regarding Ms. Rodriguez's mental residual

22    functional assessment was supported by substantial evidence; (2) the ALJ properly weighed the

23    opinions of Ms. Rodriguez's treating physicians; and (3) the ALJ did not err by using information

24    from a medical textbook.  Accordingly, the Court recommends Plaintiff's motion for reversal and/or

25    remand be DENIED and Defendant's cross-motion for summary judgment be GRANTED.

26    This Report and Recommendation is submitted to the United States District Judge assigned

27

28    [6] The diagnostic criteria was labeled Exhibit 6E and Exhibits 1A through 9F were received into evidence and made part of the record at the hearing. (A.R. at 314.)

1  to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court

2  and serve a copy on all parties on or before **February 20, 2007**.  The document should be captioned

3  "Objections to Report and Recommendation."  Any reply to the Objections shall be filed and served

4  **no later than 10 days after being served with the Objections**.

5          **IT IS SO ORDERED.**

6

7  DATED:  February 5, 2007

8

9                                              LOUISA S PORTER
                                              United States Magistrate Judge

10

11

    cc:          The Honorable William Q. Hayes
12               All parties

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28